The fourth case, White v. Fitzpatrick. Mr. Dury. Please the court. This case presents issues from a summary judgment in which the district court granted summary judgment on the plaintiff's Fourth Amendment false arrest claims, Fourteenth Amendment due process claims of destruction of exculpatory evidence and creation of false evidence, state law false arrest claims, and the Monell claim against the city of Breeze. On the false arrest claim, I would submit that the issue is whether or not this should be decided by the court in the summary judgment or whether it's a jury issue. And the standard is that whether the totality of the circumstances, including all inferences to be drawn in favor of the plaintiff, a jury could reasonably conclude that it was objectively unreasonable for officers in the position of West and Bernson to have believed there was probable cause. The facts to be considered on that, I've listed in the reply brief at some depth and the original brief. But just as a background, Fitzpatrick was in a contentious child custody dispute with Coralynn White, the plaintiff. There were motions pending. They had a child together. They were never married, but it had been a contentious custody arrangement throughout. On the day in question, which was a Sunday, Coralynn was to pick up the child who had spent the weekend with Fitzpatrick. And the arrangement was made that the exchange would happen in Greenville, Illinois, which was halfway between Breeze, where Fitzpatrick lives, and Taylorville, where Coralynn lived. It was admitted by Fitzpatrick that he lied to Coralynn and said that he didn't have a car seat, he didn't have a vehicle, she would have to come to Breeze to pick up the child. That was admitted. The police officers knew that. According to Coralynn, as soon as she stepped in the door, Fitzpatrick said, are you ready for this? He's a martial arts devotee. He's like 230 pounds. She's like 115 pounds. And he immediately hit her with his fist and knocked her to the floor right near the front door and then penned her to the floor until the police got there. She had no opportunity to wipe any blood off of the knife that was later found. How old was the child? The child was about, I think, six at the time and nine currently, if I got my number right. He was a small child. I think he was about six. Pretty sure. I think he was born in 2009. Was he in part of this or was he asleep somewhere? Or does that even matter? I don't think that's relevant to the issue, Your Honor. All right. But, I mean, he's still in Coralynn's custody, although she lost primary custody for a period of 18 months because of these charges. But she got him back eventually. There was a court hearing. Was she incarcerated? For about 24 hours until she posted bond. But she didn't have the custody during, pending all of this. Right. There was immediately, actually, Officer Bernson assisted Fitzpatrick in filing an order of protection and recommended that he do it, that this would help him in the child custody case. So, Officer Bernson was trying to help Fitzpatrick in the child custody case. And there was a relationship between the police officers and Fitzpatrick, which is identified in the brief. Anyway. Mr. Ture, I'm going to stop you for a minute. I lost my. It's not unusual for police officers to be confronted with diametrically opposed accounts of what happened. Why were the police precluded from crediting Mr. Fitzpatrick's account, given what they were told by him and by other witnesses, and given his wounds? Well, Judge Ravner, when you consider the totality of the circumstances, first of all, there was the existing contentious relationship between Fitzpatrick and the plaintiff. So his statement on that would have to be taken into consideration because of that relationship. Secondly, he admitted lying to get her to come to his house on that date. So the police knew that he was an admitted liar. Thirdly, the knife had no blood on it. And in this case, no other weapon was found. And Cora Lynn could not have had another weapon. She was searched and pinned to the floor during the entire time until she was arrested. By the way, the knife was not found until. But that's hers. I'm sorry, Your Honor. Well, this is if the police officers admit to this. I mean, there's not a dispute about these facts that there was no blood on the knife. Officer Bernson said he was shocked by the fact that there was no blood on the knife. To be consistent with a theory that Fitzpatrick, that Cora Lynn had stabbed Fitzpatrick, there would have been a hole in his T-shirt where there were two wounds, two rather superficial wounds, but a lot of blood. One of the wounds was in the upper left shoulder, but beneath the collar line of his T-shirt. There would have been a hole where if Cora Lynn had stabbed him with the knife, which would be the only weapon she could have used since no other weapon was found, if she had stabbed him with a knife, there would have been a hole where that wound was. There was blood on the shirt. There's photographs of the shirt. The police officer deliberately did not take the shirt into evidence. That was relevant to this case because, number one, if there was no hole. Could it have been negligence rather than, you know, the fact that they didn't take the shirt into evidence? Could that be a negligence? What supports the notion that it was more than negligence? Well, the police standards, first of all, say that the shirt should be taken into evidence. The training that was given to these officers said that the shirt had to be taken into evidence. The police chief said he would have taken the shirt into evidence even if the state's attorney had said, don't take it into evidence. Common sense cries out, take the shirt into evidence. And in this case, Officer Bernson testified in four different proceedings before his deposition in the current case and never mentioned the fact that he supposedly called the state's attorney to find out if he should take the shirt into evidence. In his deposition, he said he telephoned, in this case, his fifth testimony. He said he telephoned the state. He was going to take the shirt into evidence, and he telephoned the state's attorney to see if he should take the shirt into evidence. And the state's attorney said, don't take it into evidence. I had subpoenaed the state's attorney for the trial, which was coming up before the summary judgment motion was issued. But in this case, there's no reasonable police officer would telephone the state's attorney to say, should I take into evidence a shirt which has blood on it through which the alleged victim was stabbed? And should I just discard the shirt? And no reasonable state's attorney would say, don't take the shirt into evidence. The only logical reason for not taking the shirt into evidence would be that it provided exculpatory evidence to Coralyn. And in this case, it was pretty clear that the officers were trying to shift this case toward the people they knew, the Fitzpatricks. Not only that, the knife itself was not found until after Officer West had, he was the first officer to arrive. He comes into the building. He immediately handcuffs Coralyn. And inside the building at that time is Fitzpatrick and his neighbor, Jay Stacer. Jay Stacer had been there for several minutes. Jay Stacer said he had never seen, he had not seen the knife all the way up until that point. Officer West took Coralyn outside the building, handcuffed, leaving Fitzpatrick and Jay Stacer in the house alone for somewhere between 30 seconds and two minutes, according to Officer West. Certainly a jury could decide that it was a two-minute frame. When Officer West came back inside the building and was there a couple of more minutes, at that point, he, quote, discovers the knife for the first time. And Jay Stacer said he had not seen it before that point in time. Then the knife has no blood on it. And as it turned out later, no fingerprints. But he didn't dust, they didn't dust to see if there were any fingerprints on that knife. But Coralyn was saying, I know nothing about a knife. I didn't stab him. There would be, I would not have any fingerprints on it. There would be no fingerprints on it. She had no opportunity to wipe it clean. I'll take a lie detector test. Bernson said, well, no, I'm not going to give you a lie detector test. So those are some of the factors that have to be considered in the totality of the circumstances as to whether this is a jury question or a judge question on the grounds that no jury could decide that there was objective, that it would be objectively unreasonable for officers in this position to have believed there was probable cause. Did I understand you to say that there was a picture of the shirt? Yes, there was a photograph of the shirt, but you can't tell from the photograph whether there's a hole in it or not. I'm just curious how there's a photograph of the shirt, and yet it was, what, discarded or never seen again? No, no, it's in the record. The photograph is in the record. Oh, I don't mean the photograph, I mean the shirt. Yeah, well, what happened is the police officer, Officer Bernson, then said, OK, I'm not going to take the shirt into evidence. I called the state's attorney and he told me not to take it, even though I was inclined to do it before I called him. And so he leaves the shirt with the Fitzpatrick's, then they testified they destroyed it. Well, who took a picture of it? The police officer. Oh, while he was there? Right, while he was there. So they have a picture. And Judge Mannion, the picture is with the shirt on Fitzpatrick, and so it shows a little blood spot in that upper left shoulder area. That's perplexing. You suppose these guys are covered with blood, or were there a couple of bloody spots? Yeah, the picture doesn't show that much blood. There's some blood on the floor. He had a wound on his left forearm, like a slashing-type wound, and like a, I guess you would say, I don't know what kind of wound it was in the upper left-hand corner, but there was a little spot of blood there. So obviously if Coralyn had stabbed him with that knife, the only weapon she could have used, that it would have gone through the shirt. And so whether or not there was a hole in the shirt. Was there a self-inflicted, somebody cut himself just to make it look bad? Yes. Is that what you're presuming? Right, to bolster his child custody case. And the following day, after she was arrested, he filed for the order of protection, which was, Officer Bernson advised him to do that, which led to her losing custody, primary custody of the child for 18 months until she won the criminal case, and then she won the related child custody case in which the, in the child custody case, the court ruled that Fitzpatrick had not established by preponderance of the evidence, the civil standard, that she had stabbed him. In the criminal case, of course, she was acquitted. But in the meantime, there was this order of protection, which flipped the custody. She had had primary custody, but Fitzpatrick had alternate weekends. But after the child custody hearing, which happened, I think, about a month after she was arrested, but was filed the day after she was arrested, after that, she had alternate weekends custody, and Fitzpatrick had primary custody for the 18-month period, which is a loss of her liberty of interest as part of her due process claim under Count 2. So all of this adds up. I had a list of facts that were not addressed by the defendants in this case. At pages 7 through 10 of my reply brief, just a summary of some facts that should have been considered, but the absence of blood on the knife, the fact that Officer Bernson was shocked by the absence of blood on the knife, the absence of blood on the knife indicates that a different weapon was used to inflict the wounds, but there was no search of Fitzpatrick or Stacer, the neighbor, or the house to determine if there was another weapon, although Officer Bernson testified if he had known that she was claiming that she didn't stab Fitzpatrick and that there was no blood on the knife, et cetera, he would have searched them. Well, he knew all of that on the night in question, but that was his testimony in his deposition. Fitzpatrick claimed, at least initially, he was cut with a razor, not a knife. A razor. That's what he said. I mean, he said he was cut with a razor, but then later they found this knife after they were left alone in the house together, but the knife has no blood on it, and that's the only weapon that Coralyn could have used because the testimony was clear, not just her testimony, that from the moment she was knocked to the floor, she was pinned to the floor until a police officer arrived and had no opportunity to dispose of a weapon or to wipe blood off of the knife or the fingerprints or anything like that. So I suppose your position is that he cut himself with a razor. I'm sorry, Your Honor? Your position probably is that he cut himself with a razor. Yes. Or something. We don't know what he cut himself with. No, he said, he said, I'm cut with a razor. Coralyn didn't say he was cut with a razor. She said, I didn't see him cut himself, but the blood was coming down on me. He had me pinned to the floor, and blood came down on me, but I don't know what he cut himself with, but I didn't cut him, and the only other person there was him, so it had to be self-inflicted, and he did it because of this child custody case. And he had a... Was his wife there? His wife was there in the other room. She just kind of ran by, and she didn't see a knife in Coralyn's hand. She admitted that during the interview that occurred that evening. She did not see a knife in Coralyn's hand. Is her name Amber? Amber, yes. But she was not, she didn't have a firsthand eye view of the incident. She was just in the other room, and she left to go to the next-door neighbor to have him come over. These police officers from Breeze, what familiarity do they have with the East Party? What relationship?  The Officer West had a social relationship with the next-door neighbor, Jay Stacer, who was there assisting Fitzpatrick. They had been on the volunteer fire department together, which is kind of a social public service combined factor, and also Jay Stacer had some bars in the area. Most of the police officers knew him. Officer Bernson knew Fitzpatrick because he had previously complained about his child custody arrangement with Coralyn White. The Clinton County Sheriff's Department was also there, Officer Perez, Dennis Perez, and Amber Fitzpatrick had worked with him for six years because she had worked for the Clinton County Sheriff's Office for six years, and during that time she had worked with Officer Bernson because he would process detainees with her at the Clinton County Sheriff's Office. I'm trying to determine if any of these officers were aware of the domestic history, domestic abuse history. Yes, Officer Bernson, I believe it was Officer Bernson, or at least our Officer West, admitted that they had been called to the Fitzpatrick house before because there had been two incidents of domestic abuse by Fitzpatrick against his wife Amber. Yes. And there had also been a, yes, he knew about that because he investigated it, and I'm a little fuzzy on whether it was Officer West or Officer Bernson, but I think it was Officer West had investigated that incident. Oh, my. I should have done that at the beginning, but anyway, yes, they knew that. They knew that, and at the time of the arrest, Coralyn was yelling to everybody in sight that he's violent. He told her that he had killed 300 people when he was in Iraq. Now, that might have been untrue, but he told her that as a sniper. He had a history of violence. He had a history of violence with her, and so he is a violent person. Was he a sniper in Iraq? He said he was a sniper in Iraq. Coralyn said that he told her, that Fitzpatrick told her. There's no evidence. That's not an issue, I guess. It's just a background. Whether he did or didn't, he has a history of domestic violence, and the officers knew that. So these are all part of the totality of the circumstances. The recent case by this court, I think Judge Wood was the author, Hurt v. Wise. There was a case where the plaintiffs in the civil rights case, defendants in the criminal case, had admitted to murder, had confessed to murder. And in the civil rights case, the conclusion by this court was, considering the totality of the circumstances and taking the inferences in favor of the plaintiff, summary judgment should not have been entered on the issue of probable cause, even though they had confessed to murder. But when you look at the big picture, so we're saying here to the court, this is not a summary judgment issue. Looking at the totality of the circumstances, the jury should decide this, not the district judge. Thank you. I don't know if I have rebuttal. Well, we went five minutes over, but I'll make a decision on whether you should have some rebuttal. Thank you, Your Honor. Okay. Mr. Pierce. If it pleases the court, my name is Chuck Pierce. I'm the attorney for the city of Breeze, Illinois, and it's two police officers, Sergeant Mark Bernsden and Officer Thomas Wiest, who are asking that this court affirm the district court's finding of summary judgment in favor of all defendants. This case – You know, I'm going to start you off, if you don't mind, because it is really interesting to me that the decision was made to pursue the charges against Ms. White and go to trial, given the background custody dispute, the lack of blood on the knife, the lack – the failure to confirm her prints on the knife, the destroyed shirt, and so forth. Can you shed any light on that? I mean, it seems to me there was an awful lot of reasonable doubt here. Well, the ultimate issue of guilt or innocence is not relevant to the determination of the issues before the court. This is only a – Of course, but I'm talking about reasonable doubt. I'm not talking about – Reasonable doubt – excuse me, Your Honor, go ahead. Yeah. Reasonable doubt is not the proper standard for determining an issue on false arrest. The malicious prosecution claims are not before this court. They were dismissed without prejudice by Judge Gilbert and are currently pending in the state court back in Clinton County, Illinois. The issue is whether the police had probable cause or arguable probable cause under the qualified immunity standard to make the determinations which they did. The issue with regard to the blood on the knife, the fingerprints. The knife was taken into custody. It was sent to the Illinois State Police Crime Lab, and those results came back several months later. After the state's attorney had already issued an information and started the prosecution. And this is exactly in accordance with this court's edicts that say the police do not need to conduct the investigation. They can arrest if they – They don't have to show that it's – They don't have to prove that it's a convictable offense. They don't even have to prove it probably occurred. It's just a likelihood. And they can arrest, and then the prosecutors and the courts determine who's telling the truth. In this case, the system worked exactly correctly. The police were faced with a variety of differing information, as happens at every scene. Coral and White protested her innocence, as most criminal suspects do. If the police have to credit the suspect and accept her protestations at face value, arrests would never be made. We have to look at the information the officers had that day. And I'm guilty right now of an offense that I've criticized in the briefs. We're lumping together the two officers. This court has, even as recently as two weeks ago, criticized parties in court and district courts for not analyzing each officer's conduct separately when looking at liability and qualified immunity. So let's take a step back and look and see what Officer West did and what Sergeant Bernstein did. Officer West received a call. The 911 call is in the record in this case from Amber Fitzpatrick, a very impassioned call, saying, the stepmother's over there, my son's stepmother's over there. She's crazy. She's got a knife. She's on the scene, isn't she? She's on the scene. She had actually fled to the neighbor's house. Essentially, Joe Fitzpatrick said something to the effect of, this expletive is crazy. She's trying to stab me. Get the kids out of here. So Mrs. Fitzpatrick took the kids, fled to the Stacer house next door, made the 911 call. Kids? More than one? Yes, because there's one kid, one child, that is the product of Ms. White and Mr. Fitzpatrick, but the Fitzpatricks have kids on their own. Which one's the custody kid? The custody kid is named Donovan. Okay, but he was one of them. He was one of them, and again, he's a six- to eight-year-old child. He was in the bedroom, I believe, at the time this occurred. All right. The 911 call, she says, the lady has a knife. This is relayed to Officer West, who goes in around. So he knows he has an active domestic dispute where the stepmother has a knife. He arrives on scene. After Mrs. Fitzpatrick made this call, Mr. Stacer, who's a good Samaritan, runs next door to see what's going on to see if he can help. He was originally sued and then voluntarily dismissed by the plaintiff. And he finds Mr. Fitzpatrick covered in his own blood with wounds. Mr. Fitzpatrick is sizable, and he's holding down Ms. White. Officer West, when he arrives, he's invited and says, hey, and he gets in there and sees exactly the situation with Mr. Fitzpatrick holding down Mrs. White. Mr. Stacer says, this lady's screaming, I'm going to kill you all. I'm going to kill you all. Was the neighbor? What's his name? Mr. Stacer was the neighbor. Holding down Mrs. White? I think there's a dispute as to that. Mr. Fitzpatrick was primarily doing it, and I think Mr. Fitzpatrick recalls Stacer helping. Stacer doesn't recall helping. I don't think that's really relevant to what Officer West found when he came in. And I would argue that once he arrives, sees a victim who's got visible wounds, there's blood all over him, he's saying, this lady right here just stabbed me. Mr. Stacer didn't see the stabbing, but supports the fact, hey, she's been screaming, she's been saying she's going to kill you. That is eyewitness testimony, which this court has repeatedly found that in and of itself is enough to stop the investigation, to find probable cause, and to turn it over to the state's attorney, which was ultimately done in this case. The police, Officer West, seeing the circumstances there he did, to take control of the scene, separate the combatants, if you will. So he handcuffed Ms. White, led her onto the curb. By then, a deputy from the county sheriff was on scene. So Officer West then went back inside to start collecting evidence, talking to the people inside. Again, 30 seconds to two minutes, he's out of there. During the time he's now in there and he's calmed down and there's not screaming and yelling and a person being held on the floor, he can conduct an investigation and he sees a knife, and that knife ultimately is found to be one that is kept at Ms. White's house. It's the infant child's knife. So he then calls in his supervisor, Sergeant Bergen, and says, hey, boss, we've got a big one here. You might want to get on scene. Sergeant Bergen, who wasn't even on duty, comes in. He takes over the investigation. See, this is where it's important to look at the difference between which officer did which. From that point forward, West was basically uninvolved. He took some photographs, but he wasn't the investigator. Sergeant Bernstein talked to people who were already there, the deputies, trying to find out what had already occurred. He had a question about this shirt. Hey, should I take this shirt into evidence? And I believe that's a red herring. As Judge Gilbert found, there's not even really a substantive due process issue here. But the state's attorney, John Hudspeth, said, based on the information you've given me, you don't need to take that into evidence. And that goes essentially to the qualified immunity argument, where we've cited in our brief contacting the state's attorney, it's not dispositive, but it goes a long way towards shielding the police officers. What the plaintiff is trying to do here is create a new cause of action, and that cause of action is negligent investigation, that they're sloppy, that they didn't do their job properly. And this court has repeatedly, in both the Hart v. Madden case and the Askey v. Chicago case, said, well, police don't always follow their own procedures. That's not a constitutional issue. We're not here to second-guess whether they should have done this or should have done that. We're here to look whether or not probable cause exists, or, again, since this is a qualified immunity issue, arguable probable cause. Could a reasonable officer, knowing these facts, knowing that there's been a report of a lady with a knife, a victim with wounds on his arm, saying, this lady did it, the eyewitness from the neighbor saying, yep, she's crazy, she's been screaming, and all of the other factors that go into that, that is enough for probable cause. This panel asked some questions of Mr. Dury about the relationship between these officers, and I would ask the court to look closely at that in the record. I think Judge Gilbert did a fine job of saying there's absolutely no evidence of any type of favoritism between these police officers and these other people who happen to be prison guards at a federal correctional center 30 miles away. In fact, the interaction Wes had had with Joe Fitzpatrick resulted in Joe Fitzpatrick's arrest. So it's kind of ludicrous to say, well, I arrested this guy before, but now I'm going to cut him a break. I mean, that's the conspiracy theory that the plaintiffs are trying to spin here. And the court also correctly found that neither Amber nor Joe could be held liable here. They were sued under a 1983 theory, no evidence of them being a state actor, no evidence of any type of collusion acting in concert. Let's assume for a moment, hypothetically, that Joe Fitzpatrick did self-inflict these wounds and that he dropped that knife. That's not attributable to Officer Wes or Sergeant Bernson. They came in, they found a disputed, full regalia there. You've got active wounds. Fitzpatrick was taken to the hospital to get staples for his wounds before he could even come back and give his report at the police station. After this investigation, this was on a Sunday night, Sergeant Bernson filled out a statement of probable cause. Forwarded that to the state's attorney. The state's attorney, from that point forward, is responsible for what happens. And it's very telling in this case that Mr. Durie stood at this podium and said no reasonable state's attorney would do X, Y, Z. He made that same statement in his brief several times. What a reasonable state's attorney would do has nothing to do with whether there was probable cause for these officers to make an arrest of a subject who, even though she protested that she was innocent, was found next to a knife that matched up with the wounds to the victim. And, yes, Sergeant Bernson, during his interview with the victim, did give advice as to how to file an order of protection. I would argue, I would wager, excuse me, that that's advice given by every officer to every victim of a domestic incident, male or female. You've been stabbed. You may have some rights here. And I believe that statement is in the interview itself, is in the record. He didn't say, hey, you need to go out and you can get yourself an order of protection and that will get you custody. He gave standard advice that a police officer gives to every victim, putative victim or actual victim. Mr. Pierce, did you mention that the knife was connected to the child? Yes, Your Honor. The testimony, the evidence was that Joe Fitzpatrick, the father, had given his son some knives over the years. And this was a small penknife, if you will, that he'd given to the son that the son kept at the mother's house, kept at Coraline's house. That's actually part of the police report where you can see that that's included in the record. So we believe that this is a question of law in this case. Summary judgment, I mean, excuse me, probable cause can't be a question for the jury. But as this court stated in Jones by Jones v. Webb, when the facts are undisputed, and they are here as to what the police officers knew, this can't be determined as a matter of law. The cases where this court has overturned summary judgment in a case like this have to do with, Mr. Doreen mentioned the Hart case, coerced confession. There's no coerced confessions. There's no dropped, you know, fabricated evidence. There is no evidence whatsoever that the police did anything other than their job, with the exception of there's an allegation they were sloppy. And sloppy police work, not following your model policies, is not a constitutional violation. Unless there are any further questions, I would ask. Just one little bit. Yes, sir. There's a lot else pending in state court. Is that correct? Correct. The plaintiffs have refiled the malicious prosecution and abuse of process claims in state court. They're currently under a motion to dismiss status at this point. That's under advisement by the Clinton County Judge. Okay. Thank you, Your Honor. We granted over 20 minutes, as it turned out, but you may have two minutes for rebuttal. Thank you, Your Honor. Then I'll try to hit a few quick topics. Robert Fix, the police chief, said he would have taken the shirt in Japanese no matter what the state's attorney said. And that's what the police standards say. It should be taken into evidence. The state law claim against the Fitzpatricks has nothing to do with what the police officers believed or didn't believe about probable cause. It's a clear case where Coralyn says that he stabbed himself. I didn't stab him, and he had me arrested under state law. She has a false arrest claim, but the district judge just kind of threw that in with everything else and granted summary judgment on that claim, too. Clearly, there's a disputed fact on that. What about this knife that was brought to the scene? The testimony from Coralyn is I had never seen the knife. I didn't bring it. I didn't have anything to do with it. It's not my knife. She disputes that it was a son's knife? Yes. And in addition to that, there's no evidence that it could have been the weapon used. There's no blood on the knife. There's no fingerprints. There's nothing. There's a lot of blood on the floor. I mean, there would have been blood on the knife if it had been used, certainly. As far as a police officer just taking one, you know, you have two competing versions. Judge Easterbrook in the Askew v. City of Chicago case, which is cited in the brief, says if there's reason to doubt the veracity of the alleged victim, you have to do more. You can't just say I can pick between the competing choices here. There's plenty of reason to doubt that. The arguable probable cause argument on qualified immunity, Fleming v. Livingston and Hart v. Wise, as we stated in our brief, are consistent. And the real issue is could a jury, considering the totality of the circumstances, have concluded that this was objectively unreasonable for officers in the position of West and Bernson to have believed there was probable cause? And my time is up. All right. Thank you. Thanks to both counsel. Case is taken under advisement.